FREDERICK J. BAUMANN, Appellant, v. CITIZENS TRUST COMPANY OF BINGHAMTON, JOSEPH A. BRODERICK, Superintendent of Banks of the State of New York, and AUGUST IHLEFELD, JR., Deputy Superintendent of Banks of the State of New York, in Charge of the Liquidation of CITIZENS TRUST COMPANY OF BINGHAMTON, Respondents. (Action No. 1.)

ALBERT C. CROSSLEY, Appellant, v. CITIZENS TRUST COMPANY OF BINGHAMTON and Others, Respondents. (Action No. 2.)

NORMAN G. KEISER, Appellant, v. CITIZENS TRUST COMPANY OF BINGHAMTON and Others, Respondents. (Action No. 3.)

WILLIAM C. KING, Appellant, v. CITIZENS TRUST COMPANY OF BINGHAMTON and Others, Respondents. (Action No. 4.)

BENJAMIN G. KROEHLER, Appellant, v. CITIZENS TRUST COMPANY OF BINGHAMTON and Others, Respondents. (Action No. 5.)

JESSE E. TRUITT, Appellant, v. CITIZENS TRUST COMPANY OF BINGHAMTON and Others, Respondents. (Action No. 6.)

ARCHIBALD WHITELAW, Appellant, v. CITIZENS TRUST COMPANY OF BINGHAMTON and Others, Respondents. (Action No. 7.)

FRANK J. MANGAN and Others, a Copartnership Doing Business under the Firm Name of MANGAN & MANGAN, Appellants, v. CITIZENS TRUST COMPANY OF BINGHAMTON and Others, Respondents. (Action No. 8.)*

Third Department, June 25, 1936.

* See decision on reargument, 249 App. Div. 369.

10

*Hinman, Howard & Kattell* [*Morris Gitlitz* of counsel], for the appellants Baumann, Crossley, Keiser, Kroehler, Truitt and Whitelaw.

*Lusk, Buck, Ames & Folmer* [*Clayton R. Lusk* of counsel], for the appellant King.

*Mangan & Mangan* [*Thomas J. Mangan* of counsel], for the appellants Mangan.

*Lee, Levene, Verreau & McAvoy* [*David Levene* of counsel], for the respondents.

RHODES, J. These actions in equity were brought to recover as preferred claims money alleged to have been placed with the Citizens Trust Company of Binghamton as bailee, and which moneys it is claimed were deposited by the bailee with other funds of the trust company, contrary to the terms of said bailment.

The record is voluminous; and in order to keep this discussion within reasonable limits, reference can only be made in the main to ultimate facts, inferences and conclusions deemed established by the evidence.

The said trust company was organized and doing business under the Banking Laws of the State of New York. With the exception of Mangan & Mangan each plaintiff was a stockholder and most of plaintiffs were directors.

Mangan & Mangan is a partnership engaged in the practice of law. The partners are Thomas J. Mangan, Frank J. Mangan and Charles J. Mangan, Frank J. owning ninety shares of stock of the trust company, and Charles J. owning five shares. Thomas J. had formerly been the owner of 100 shares of stock which he transferred to his son July 18, 1931.

In May, 1931, a regular semi-annual examination of the affairs of the trust company was made in behalf of the Superintendent of Banks, and through the shrinking in the valuation of securities it then appeared that the capital of the trust company was impaired

to the extent of $95,000. The matter was placed by the Superintendent in the hands of his deputy, George W. Egbert, who immediately called the attention of certain of the officials and directors of the trust company to the situation, informing them that the impairment must be made good or the trust company would be closed.

Numerous conferences were held as to what should be done, the deputy stating that an assessment would have to be levied or contributions otherwise made by the interested stockholders and directors, and that an assessment would undoubtedly cause a run on the bank necessitating its immediate closing. All parties recognized the necessity of secrecy and the urgency of immediate action. The deputy produced a copy of an agreement which he stated had been used in similar cases with other banks, and from this form an agreement was prepared by Frank J. Mangan, who was a director and counsel for the bank. This agreement bearing date August 3, 1931, was signed by each of the plaintiffs, and they in the aggregate subscribed the sum of $80,000 towards the $95,000 required to make good the impairment of capital.

The agreement is in terms between the trust company and " the undersigned persons, who are directors or stockholders of said corporation." It provides in part that, " Whereas, it is desired that additional security be given to the depositors of said Citizens Trust Company of Binghamton, now, therefore, in consideration of the premises and the sum of One dollar paid by said Citizens Trust Company of Binghamton to the undersigned persons and each of them, and for such other good and sufficient consideration by each of them received, said undersigned persons do hereby agree to deposit securities or cash in the amount set opposite their respective signatures as hereinafter appears, and as itemized in the attached schedule which is made a part hereof, the same to be held by the said Citizens Trust Company of Binghamton for the better security of the depositors of said Citizens Trust Company of Binghamton."

The agreement further provides that it shall continue in force and effect until the securities of the trust company shall have appreciated sufficiently in the opinion of the Banking Department to protect the depositors, at which time the subscribers shall be released from the terms thereof and said securities restored to their respective owners.

And it further provides, " That in case of a possible liquidation of said Citizens Trust Company of Binghamton, these securities or cash deposited hereunder shall be applied, if necessary, to the payment of the depositors of said Citizens Trust Company of

Binghamton, and any balance remaining after said depositors have been paid in full, shall be returned to the parties hereto *pro rata,* and any deficiency arising by reason of the application of said securities or cash to the payment of said depositors shall be repaid to the parties hereto by said Citizens Trust Company of Binghamton, remaining after said depositors have been paid in full."

It was testified that it was generally understood among the plaintiffs who subscribed the agreement that the money should not be placed in the funds of the bank for the purpose of making good the impairment until the entire $95,000 was either subscribed or paid in. It is not clear from the testimony whether the condition was that the money should all be subscribed or all paid in. In any event, the trust company, as a corporate entity, made no such agreement with the subscribers. Whatever the arrangement, it was confined to the plaintiffs among themselves and with Russell, their subordinate, and thus unilateral, so far as concerned the trust company. For this reason it is unnecessary to give further consideration to any contention that there was a binding agreement between the trust company and the subscribers establishing precedent conditions concerning the paying in and use of the money to make good the impairment of capital, before the agreement should become operative.

The respective plaintiffs claim, however, that the amount representing the subscription of each subscriber was placed in the hands of one Fred D. Russell, treasurer of the trust company, in behalf of the trust company, as bailee, to be held until the entire $95,000 was raised. The deputy at the time refused to recognize any such condition, and when it was called to his attention he asserted that there were no such existing conditions so far as the Banking Department was concerned. He stated that in view of the fact that $80,000 had been raised he would " go along " and permit the bank to remain open if the remaining $15,000 were raised without delay. Shortly after the $80,000 subscribed had been placed in Russell's hands, and on the 12th day of August, 1931, he received a phone call from Egbert from New York, inquiring as to the progress being made. Russell informed him that he had the $80,000 in his possession, and Egbert asked him, " Why don't you put it in the bank? " To which Russell replied, " I have not been so instructed." And Egbert said, " You put it in the bank at once or something will happen." After this conversation, on the same day, Russell took the $80,000 from the safe deposit box and put it in the bank and made out a slip to be used by the bookkeeper so that the records would show on the sheet as he was instructed to put it on by the Department, and

an entry was placed on the books of the trust company showing the payment into the funds of the bank of said $80,000, and contains the following statement: "Contributions made by following persons of amounts set opposite names in accordance with agreement dated August 3, 1931." Then follow the names of the respective plaintiffs with the amount contributed by each, as aforesaid. As soon as the $80,000 was deposited with the funds of the bank, Russell, the treasurer, used over $75,000 thereof to pick up certain notes which had been rediscounted by the trust company. The said $80,000 remained on deposit in said account, earmarked as aforesaid, at all times from August 12, 1931, until the closing of the trust company.

Most of the directors were informed of what had happened at a meeting of the discount committee the following day, and the evidence warrants the inference that each of the plaintiffs had knowledge or was chargeable with knowledge of the facts. It appears that several of the plaintiffs expressed disapproval at what had been done, but no protest was made to the Banking Department, no effort was made to change the entries on the books of the bank, no demand was made for any change in entries or a repayment of the moneys and no action was brought prior to the closing of the trust company for the recovery of such deposits.

There is no claim of any concealment of the facts by Russell. He testified that at the various conferences and meetings he informed those present of the facts and the evidence throughout indicates this.

It was also testified by Crossley, one of the directors and one of the plaintiffs, "I think we were all agreed there was nothing to do but raise the money."

Notwithstanding what had been done with the $80,000 which had been brought to the actual notice of most of the plaintiffs, an attempt was made to raise the additional $15,000 and for that purpose a new agreement dated September 25, 1931, identical in terms with the first agreement, was signed in behalf of the trust company and by the subscribers by which subscriptions to make up the additional $15,000 were pledged, F. J. Baumann, the president, subscribing $1,500; Mangan & Mangan, $1,000; Whitelaw, $1,000; Truitt, $1,000; Kroehler, $1,000; H. Paul Althaus, $5,000; Speh, $2,000; Crossley, $1,000; Keiser, $1,500. Of these amounts pledged under the second agreement $6,500 was placed in the hands of Russell, the plaintiffs claiming that it was deposited subject to the same conditions as those governing the original $80,000 which previously had been raised.

It is worthy of note that when the second agreement containing the subscriptions for $15,000 toward the impairment of capital was received by the trust company, it then was in possession of subscriptions to the full amount of $95,000 and the subscriptions thereupon became assets of the trust company whether paid in at the time or not. Thus, if the conditions alleged to have been imposed by the plaintiffs were that the funds should be held by bailee until $95,000 was subscribed and provided for, then the condition had been fulfilled.

On September 29, 1931, the trust company was taken over in liquidation by the Banking Department, the closing being on account of its cash position and demands made upon it by depositors. The cash and securities amounting to $6,500 which had been placed in Russell's hands under the terms of the second agreement were kept by him in his possession until the closing of the trust company, when he was asked in behalf of the Banking Department to turn them over and he did turn them over to the man in charge of the bank under the Superintendent, and on September 30, 1931, the amounts collected were run through the books of the bank as assets. The plaintiffs claim that these moneys and securities were also improperly turned over to the bank in contravention of the conditions under which they were delivered to the bailee, but each of said written agreements was a valid contract by which the signers and subscribers were obligated to pay the amount of their said subscriptions to the trust company " for the better security of the depositors," so that if it be assumed that the moneys and securities were paid into the funds of the trust company contrary to the instruction of the plaintiffs, nevertheless, these amounts were due from the plaintiffs to the trust company and, therefore, plaintiffs equitably have suffered no redressable wrong as against the depositors by the application of the funds for " the better security of the depositors."

Some of the plaintiffs made payments of their subscriptions after knowledge that the $80,000 had been placed in the funds of the bank and in one or two instances payments were made after the closing of the trust company.

Between the time of the signing of the first agreement and the closing of the trust company it received commercial deposits totalling $1,792,370.55, and interest deposits totalling $67,020.97. During the course of liquidation dividends amounting to sixty-five per cent have been paid to depositors.

The court below found properly and upon adequate evidence that the agreements were good and valid and for a valuable consideration (*Leary* v. *Capitol Trust Co. of Schenectady*, 238 App. Div.

661; affd., 263 N. Y. 640); that the said payment of $80,000 was made under and pursuant to said agreement of August 3, 1931; that each of the plaintiffs ratified the deposit of said $80,000 in the trust company; that each of the plaintiffs is estopped from claiming that there was a condition that $95,000 was to be raised before the said agreement of August 3, 1931, was to take effect; that there were no conditions precedent which had to occur or be performed before the said agreement of September 25, 1931, was to take effect; that the $6,500 covered by the said agreement of September 25, 1931, was paid to the trust company by the persons who made the payments under and pursuant to said agreement of September 25, 1931, and that each of the plaintiffs has waived any alleged condition that $95,000 was to be raised before the said $80,000 should be deposited and placed upon the books of the trust company; that $80,000 of the impairment of capital was taken care of in a manner satisfactory to the Superintendent of Banks by the deposit of the $80,000 in the trust company on August 12, 1931, under the agreement of August 3, 1931, and that the balance of the impairment was taken care of in a manner satisfactory to the Superintendent of Banks by the agreement dated September 25, 1931.

On behalf of Mangan & Mangan it is insisted that although Frank J. Mangan may have known of the facts, there is no proof that the remaining partners had knowledge, and furthermore, that under the Partnership Law knowledge of Frank J. Mangan is not chargeable to the remaining partners. It is a fair inference warranted by the evidence that irrespective of the rules of partnership law, Frank J. and Thomas J. Mangan were acting as representatives of the firm for the interest of all, with authority to act as such representative and agent and the inference is warranted that each member of the firm knew or was chargeable with knowledge of the facts, and that they intended that the acts of their representative were to be binding upon each member.

As to the plaintiff King, it is asserted that he did not have complete knowledge of the facts and, therefore, that he should not be held to have waived, acquiesced or be estopped by what was done. He was not a director, but had formerly held such office. Having removed to Boston, where he was the head of a large corporation, he had resigned as director, but continued as a stockholder. It is asserted that when he signed the agreement to pay his subscription it was done upon the conditions above stated, and while he admits that while in Binghamton he was informed that the $80,000 including his subscription of $15,000

had been paid into the funds of the trust company and entered on the books, he did not know the form of the entry. We think the situation imposed the duty to investigate, and that sufficient actual knowledge was brought home to him to require him to investigate, and being under the duty to investigate he is chargeable with all the knowledge which a reasonable investigation would have imparted, and that this rule applies to all the other plaintiffs.

It is a general rule that where there is a duty to investigate, if a person has knowledge of such facts as would lead a fair and prudent man using ordinary thoughtfulness and care, to make further accessible inquiries, and he avoids the inquiry, he is chargeable with the knowledge which by ordinary diligence he would have acquired. Knowledge of facts which, to the mind of a man of ordinary prudence, begets inquiry, is actual notice, or, in other words, is the knowledge which a reasonable investigation would have revealed. (*Fidelity & Deposit Co.* v. *Queens County Trust Co.*, 226 N. Y. 225.)

·This rule is resorted to from necessity and with reluctance, and for the purpose of finding a ground of preference between equities otherwise equal. (*Curnen* v. *Mayor*, 79 N. Y. 511.)

The present actions are in equity, and the plaintiffs are, therefore, bound by equitable principles. They were chargeable with knowledge that if their money was placed in the bank and the entries made showing that such moneys were an asset of the bank, the depositors, in equity, would have a right to rely upon the situation thus created, and that their equities would be superior to those of plaintiffs. (*Bay Parkway National Bank* v. *Shalom*, 270 N. Y. 172; *Matter of Hudson River Trust Co.*, 248 App. Div. 643.)

So far as the plaintiffs who were directors are concerned, the entries made upon the books of the trust company were made by their employee and agent, Russell; they were his superiors, and his acts and his entries standing, uncorrected, constitute an admission against such directors, because as directors they had it in their power to order a correction in the entries and a repayment of the moneys if they had wrongfully been put into the funds of the trust company. As to all of the plaintiffs who had knowledge or were chargeable with knowledge of the actual facts, none made any effort to effect any change in the minutes or entries on the books, or a withdrawal of the funds, constituting the $80,000, and none prior to the closing of the trust company made any effort, by suit or otherwise, to recover the payments made. Their silence, therefore, constituted an acquiescence, waiver and estoppel. (*Rothschild* v. *Title Guarantee & Trust Co.*, 204 N. Y. 458; *Alsens A. P. C. Works* v. *Degnon Contracting Co.*, 222 id. 34.)

It is argued by plaintiffs that the Superintendent of Banks, having agreed to permit the trust company to continue in operation if the $95,000 impairment of capital were made good, and it having been made good, therefore, the Superintendent of Banks, when he closed the trust company, thereby breached his agreement. It is clear, however, that the Superintendent could make no such binding agreement. He was charged with the duty of using his best judgment concerning the trust company, and if it became necessary for the protection of depositors to close the bank it was his duty so to do at any time, and he could not preclude himself from so doing by any agreement to the contrary.

We fully concur in the statement in the opinion of the court below that " No charge, and no intimation has in any manner been made, nor was any condition disclosed by the examination which indicated malfeasance, misfeasance or nonfeasance on the part of the officers and directors of the Citizens Trust Company. They had been, and they were, striving in a difficult situation to maintain the stability and the solvency of the institution with which many of them had been so long connected."

The courageous and energetic efforts put forth by the plaintiffs to save the institution, the fortitude with which they voluntarily assumed these obligations, command admiration, and the situation in which they were left despite their well-intentioned efforts is such as to excite sympathy, but in balancing the equities, we are bound to give greater weight to the claims of the depositors.

We are inclined to agree with plaintiffs that having voluntarily agreed to make good the impairment and their subscriptions having been used for that purpose, in equity they should be repaid before any payments should be made to other stockholders who contributed nothing voluntarily. Equitably the rights of plaintiffs seem superior to non-contributing stockholders, but subordinate to those of the depositors. It does not appear that after the payment of the claims of depositors there will be anything left to pay the stockholders, but plaintiffs' rights in this respect should be safeguarded and preserved. (See *Matter of Hudson River Trust Co., supra.*)

For all of the foregoing reasons the judgments should be modified so as to provide that they are without prejudice to the rights of plaintiffs to assert their claims to preference and priority over non-contributing stockholders, in case it later shall appear that there are funds available therefor after payment of claims of depositors and the expenses of liquidation, and as so modified the judgments should be affirmed, with one bill of costs to the defendants.

HILL, P. J., and McNAMEE, J., concur; CRAPSER and HEFFER-NAN, JJ., dissent and vote to reverse the judgments appealed from on the law and facts, and to award judgments to the plaintiffs for the relief demanded in their complaints, with costs.

Judgments modified in accordance with opinion, and as so modified affirmed, with one bill of costs to the defendants.